```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
v.                                 )
                                   )    Criminal Action
EDSON GOMES,                       )    No. 24-cr-10082-PBS
                                   )
                    Defendant.     )
_____)
```

**MEMORANDUM AND ORDER**

May 12, 2025

Saris, D.J.

**INTRODUCTION**

Defendant Edson Gomes is charged with being a felon in possession of ammunition and with possession with intent to distribute 40 grams or more of fentanyl. He moves to suppress all evidence supporting the charges, arguing that it was unlawfully obtained following a warrantless entry into an apartment and an unlawful seizure.

After a two-day evidentiary hearing, at which State Troopers Matthew Morrissey and Alfred Silveira and the mother of Gomes's child testified, the Court **DENIES** Gomes's motion to suppress (Dkt. 57).

**BACKGROUND**

The following factual findings are drawn from the testimony and exhibits presented during the two-day evidentiary hearing,

1

including body-worn camera footage of the troopers' encounter with Gomes.

## I. Homicide Investigation

In July 2023, Thomas Andrade Junior was murdered in Brockton, Massachusetts. During the investigation, law enforcement identified Gomes as a potential witness with information relevant to the homicide. Gomes had previously been convicted in federal court of conspiracy to possess with intent to distribute and to distribute fentanyl and was on supervised release at the time. In that same case, he was also charged initially with carrying a firearm during and in relation to drug trafficking, but that charge was later dismissed. As conditions of his supervised release, Gomes was prohibited from entering Brockton or knowingly associating with other felons.

## II. Surveillance of 133 Ames Street

After learning that Gomes might possess information related to the homicide, State Trooper Matthew Morrissey began searching for him. He was familiar with Gomes's prior federal charges. He checked multiple addresses where he suspected Gomes may reside but was unable to locate him. Morrissey then learned from a member of the Brockton Police Department that an associate of Gomes, Natalio Miranda, resided at 133 Ames Street in Brockton. He began surveilling the address, and, on August 9, 2023, observed a person

2

matching Gomes's description exit a red Chrysler sedan and enter the building.

The following week, Morrissey returned to 133 Ames Street with State Trooper Alfred Silveira. They again observed the red Chrysler sedan, which was departing from the property. After witnessing a minor traffic violation, the troopers conducted a stop of the vehicle. The driver, known to them as a close associate of Gomes's cousins, denied having come from 133 Ames Street and claimed to not know Gomes. Given that the troopers had just seen the vehicle leave the address, they found these denials not credible.

That same day, Morrissey and Silveira returned to the property and, around 4:00 pm, approached the rear of the building. In the backyard, they encountered the landlord and asked for permission to enter the building to knock on the apartment doors. The landlord consented. On the second floor, the officers spoke with a tenant who initially stated that Gomes resided there, but upon being shown a photo of Gomes, told the troopers he did not live there. During that conversation, the officers heard movement from upstairs and proceeded to the third floor. From the staircase, the troopers could see that the door to the third-floor apartment was open, and Gomes and Miranda were standing in the open doorway, just inside the apartment.

III. **The Encounter with Gomes**

Silveira approached the doorway, placed his foot on the door jam, and used his arm to block Gomes from closing the apartment door. Morrissey then told Gomes to "step out" and stated that he was "violating his federal probation." BWC2-056960 at 16:05-16:06. Gomes moved slightly backward, stepping with his right foot so that his right side was angled away from the door, a posture Morrissey described as "blading." He then said that he had spoken to his parole officer. After several additional commands to "step out," Gomes said, "alright, let me grab my [indiscernible]," turned, and began walking deeper into the apartment.

As Gomes walked away, Silveira took multiple steps into the apartment and grabbed Gomes's arm. Morrissey, now standing in the apartment's doorway, observed the handle of a firearm protruding from Gomes's right pocket. Morrissey seized the firearm. Gomes was handcuffed, and a search of his pockets revealed four bags of fentanyl, a large amount of cash, a cell phone, and a vehicle key. Miranda was also placed in handcuffs. The officers conducted a protective sweep of the apartment and observed an open clear plastic bag containing white powder, a digital scale, a flip phone, and scissors.

IV.   **Search Warrant and Subsequent Search of the Apartment**

Based on these observations, Morrissey applied for a warrant to search the apartment. The supporting affidavit included two inaccuracies: Morrissey incorrectly stated that the firearm was

4

recovered from Gomes's left, instead of right, pocket and, more significantly, averred that Silveira had restrained Gomes without entering the apartment.

The search warrant was granted and executed the same day. In addition to the items described above, investigators seized another digital scale, a second cell phone, and assorted paperwork in Gomes's name.

Gomes now moves to suppress both the evidence found in the apartment and the evidence, including the firearm, cash, and fentanyl, recovered from his person.

## DISCUSSION

### I. Standing to Challenge the Entry into the Apartment

It is well established that to invoke the exclusionary rule based upon an alleged Fourth Amendment violation, the defendant "must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004) (quoting United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)). The reasonable expectation of privacy inquiry is two-fold: "first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation 'is one that society is prepared to recognize as objectively reasonable.'" United States v. Battle, 637 F.3d 44, 48-49 (1st Cir. 2011) (quoting United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009). The

5

defendant bears the burden of establishing both elements. See United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016).

Gomes argues that he had a subjective expectation of privacy in the apartment because he was an overnight guest. At the evidentiary hearing, the mother of Gomes's child testified that she had spent the night with Gomes at 133 Ames Street on August 13, the evening before the police encounter, and that Gomes had been residing there for several months and possessed keys to the apartment. Through her testimony, Gomes has met his burden of establishing that he was, at minimum, an overnight guest at 133 Ames Street. See Romain, 393 F.3d at 68 (finding expectation of privacy in the apartment where defendant had keys and stayed overnight); Minnesota v. Olson, 495 U.S. 91, 96–97 (1990) (holding that defendant's status as an overnight guest is alone enough to show he had an expectation of privacy in the apartment).

But a subjective expectation of privacy is not enough; it must also be one "that society accepts . . . as objectively reasonable." United States v. Vilches-Navarrete, 523 F.3d 1, 13 (1st Cir. 2008). In the context of trespassers, the First Circuit has held that "[a] defendant lacks a legitimate expectation of privacy in a place" in which he is trespassing because "he does not have permission to be present." Battle, 637 F.3d at 49 (no reasonable expectation of privacy when defendant lacked permission to be in someone else's apartment); see also United States v.

6

McCarthy, 77 F.3d 522, 535 (1st Cir. 1996) (no legitimate expectation of privacy in suitcase left in trailer where defendant remained after being told to leave); United States v. Lnu, 544 F.3d 361, 366 (1st Cir. 2008) (no expectation of privacy in a storage locker after lease default). More broadly, the First Circuit has recognized that "[g]enerally, one cannot form a legally recognizable expectation of privacy in a place where one is not legally allowed to be." United States v. Bey, 825 F.3d 75, 79 (1st Cir. 2016).

The principle that one cannot claim a legitimate expectation of privacy in a place he is not legally permitted to be extends logically to violations of court orders such as conditions of supervised release. Appellate courts that have directly addressed this question have consistently concluded that a defendant's unlawful presence due to a court order defeats any reasonable expectation of privacy. See, e.g., United States v. Cortez-Dutrieville, 743 F.3d 881, 884-85 (3d Cir. 2014) (no reasonable expectation of privacy in a home where defendant stayed overnight in violation of a protective order, even with the resident's consent); United States v. Schram, 901 F.3d 1042, 1046 (9th Cir. 2018) (same); Commonwealth v. Morrison, 710 N.E.2d 584, 586 (Mass. 1999) (same); State v. Stephenson, 760 N.W.2d 22, 27 (Minn. Ct. App. 2009) (same).

Here, Gomes was not permitted to enter Brockton under the terms of his court-ordered supervised release. By violating that court order, Gomes was on property that the law prevented him from entering. Accordingly, any subjective expectation of privacy he may have held is not one that society would recognize as reasonable. He therefore lacks standing to challenge the initial warrantless entry or the subsequent warrant-based search that flowed from it. And, as a result, he cannot challenge the investigative stop under Terry v. Ohio, 392 U.S. 1 (1968) on the basis that the troopers' presence inside the apartment was unlawful because they lacked a search warrant. See United States v. Orth, 873 F.3d 349, 355 (1st Cir. 2017) ("Fourth Amendment rights are personal, and a proponent of a motion to suppress must prove that the challenged governmental action infringed upon his own Fourth Amendment rights." (quoting United States v. Kimball, 25 F.3d 1, 5 (1st Cir. 1994))); see also United States v. Johnson, 57 F. App'x 875, 877 (1st Cir. 2002) (finding that defendant could not challenge his Terry stop on the basis that officers entered a private driveway when defendant lacked a privacy expectation in that driveway); United States v. McNeal, 955 F.2d 1067, 1076 (6th Cir. 1992) (holding that a defendant who lacks standing to

8

challenge an entry cannot argue that a subsequent search of his person was tainted by the allegedly unlawful entry).[1]

Although Gomes cannot challenge the entries into the apartment, he may still assert that the seizure of his person violated the Fourth Amendment. The Court therefore turns to whether the officers' encounter with Gomes constituted a lawful investigatory stop.

## II. The Seizure of Gomes's Person

A seizure occurs under the Fourth Amendment "when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" United States v. Howard, 66 F.4th 33, 40 (1st Cir. 2023) (quoting United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011)). The central inquiry is "whether 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. at 42 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (plurality opinion)).

To justify a brief investigatory stop under Terry, law enforcement "must possess 'reasonable, articulable suspicion of an individual's involvement in some criminal activity.'" Id. at 44

---

[1] Gomes's reliance on Romain is misplaced: there, the defendant had standing to challenge the entry into the apartment, and the First Circuit rejected the defendant's claim that the framework for evaluating Terry stops should not apply to seizures in residential settings. See Romain, 393 F.3d at 68, 70, 75.

9

(quoting United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017)). "Reasonable suspicion is a concept, not a constant, and defies exact definition." United States v. Pavao, __ F.4th __, __ (1st Cir. 2025) (per curiam) [2025 WL 1135076, at *4]. It must be "both objectively reasonable and 'grounded in specific and articulable facts.'" United States v. Sierra-Ayala, 39 F.4th 1, 14 (1st Cir. 2022) (quoting Camacho, 661 F.3d at 726). While "reasonable suspicion requires more than a mere hunch," it demands "less than probable cause." United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008).

Before assessing whether the troopers had reasonable suspicion to stop Gomes, the Court must first determine the moment at which Gomes was seized. See Howard, 66 F.4th at 44 (explaining that reasonable suspicion must exist "at the inception of the stop"). The government argues that the seizure occurred the moment Gomes retreated into the apartment and Silveira followed and grabbed his arm to bring him back to the doorway. In contrast, Gomes contends that the seizure occurred earlier when Morrissey repeatedly ordered him to "step out" of the apartment. According to Gomes, this timing matters because, at that earlier point, he had not yet "bladed" his body.

Gomes concedes that when Morrissey demanded he step out of the apartment, there was no use of physical force. Instead, Gomes argues that those demands constituted a show of authority. But for

10

a seizure to occur "by a show of authority and without the use of physical force," there must be "actual submission." Brendlin v. California, 551 U.S. 249, 254 (2007). Here, Gomes did not submit -- he remained in the apartment and even turned around to walk away from the officers. The seizure thus occurred moments later when Silveira grabbed Gomes by the arm and brought him back to the doorway. See United States v. Sokolow, 490 U.S. 1, 7 (1989) (assuming that seizure occurred when officers grabbed defendant by the arm and moved him to the sidewalk).

At that moment, the troopers had reasonable, articulable suspicion that Gomes was engaged in criminal activity. The troopers knew he was on supervised release for a prior federal drug conviction, was prohibited from being in Brockton or knowingly associating with felons, and was residing in an apartment in Brockton with Miranda, another known felon. They had observed a person drive away from the apartment building and deny having done so. Upon approaching the apartment, they saw Gomes in the doorway with sagging pants, suggesting he had something heavy in his pocket, and observed him "blade" his body away from them. Though any one of these factors on their own may be insufficient, taken together, these observations supported a reasonable suspicion that criminal activity was afoot. See United States v. Langston, 110 F.4th 408, 421-22 (1st Cir.) (explaining that courts must look to

11

the totality of the circumstances to determine whether there was reasonable suspicion), cert. denied, 145 S. Ct. 581 (2024).

Once Silveira brought Gomes back to the doorway, the handle of a firearm protruded from Gomes's pocket in plain view of Morrissey. See United States v. Cintron, 592 F. Supp. 2d 198, 202 (D. Mass. 2008) (applying the plain view doctrine to a seized gun when the officer observed the gun protruding from the defendant's pocket), aff'd, 724 F.3d 32 (1st Cir. 2013).[2] Because the troopers had reasonable suspicion at the time of the seizure and the firearm was plainly visible, the stop and subsequent search incident to arrest were lawful. As a result, none of the evidence recovered from Gomes's person is suppressed.

## ORDER

For the foregoing reasons, Gomes's motion to suppress (Dkt. 57) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris

---

[2] Gomes does not challenge the government's invocation of the plain view doctrine. But even if the firearm had not been in plain view and was instead discovered during a pat-frisk, the specific and articulable facts outlined above, combined with the nature of the homicide investigation in which Gomes was a person of interest, provided reasonable suspicion that he was "armed and dangerous such that a pat-frisk would be permissible." United States v. Harrington, 56 F.4th 195, 203 (1st Cir. 2022).

                                                        United States District Judge